[Civ. No. 1235.   Fourth Appellate District.—June 18, 1934.]

SEABOARD DAIRY CREDIT CORPORATION (a Corporation), Appellant, v. D. M. HERMAN, Respondent.

Walter J. Little, W. Eugene Craven and Aldrich & Mack for Appellant.

M. G. Brittan, W. E. Kalbfleisch and Alfred Siemon for Respondent.

HAINES, J., *pro tem.*—As of date July 25, 1930, respondent D. M. Herman, of Wasco, California, a grower of alfalfa hay, executed to one George E. Martin, operating at Los Angeles, California (apparently under the fictitious name Vernon Feed & Milling Co.), a bill of sale acknowledging receipt from Martin of $5,500, and, in consideration thereof, conveying to Martin:

"Five hundred (500) tons No. 1 quality baled alfalfa hay, now stored in barns located on lots 90 and 211–31 Fourth Extension Colony.

"Said hay to be loaded on cars F. O. B. Wasco, California, as ordered by the buyer, on or before January 1st, 1931."

The parties also executed a contract in writing headed "Hay Contract". This contract began as follows:

"In conjunction with Bill of Sale made on this day at Wasco, California, . . . 1930, Geo. E. Martin Buys and

D. M. Herman sells 500 Tons No. 1 quality alfalfa hay @ $11.00 per ton (a little more or less) said hay being located in barns located on land described as follows:

_____.

"I agree to deliver the hay purchased in good order and in accordance with contract terms and conditions as herein specified.

"F. O. B. cars as ordered by Buyers, by January 1st, 1931, which time may be extended with Buyer's consent but not otherwise."

After certain further provisions, including those concerning the manner of delivery, there appears a paragraph as follows:

"Part payment of $1.00 is hereby acknowledged in consideration of above. Advance of $3.00 per ton is to be made as soon as all papers are signed. Balance to be paid when hay is unloaded in good order."

Then follow certain other provisions which we need not recite. The contract is signed "D. M. Herman, Address Wasco, Calif.", and "Vernon Feed & Milling Co. By. Geo. E. Martin". Respondent Herman testified that he received from Martin the contract and bill of sale at the same time; that the contract was actually signed on July 25th, but that he kept the bill of sale and did not sign and deliver it until some days later.

At the time these writings were executed respondent Herman had upon his premises more than 500 tons of alfalfa hay in barns and a further quantity in the fields. All of it was mortgaged to the Bank of Italy by a chattel mortgage on which there was an unpaid balance of $3,070.58.

Under date July 29, 1930, Martin contracted in writing to sell 500 tons of U. S. Grade No. 1 leafy alfalfa hay to one Luckensmeyer at $18 per ton, 13 tons to be delivered at once and the rest during December, 1930, and January and February, 1931, Luckensmeyer to pay for each shipment within 30 days after delivery.

At some time late in July, 1930, Martin approached appellant Seaboard Dairy Credit Corporation for a loan and told one Knox, its secretary and manager, that he, Martin, could get 500 tons of hay, but that it was then mortgaged to the Bank of Italy (the idea evidently being to pay off the bank from what appellant was to loan). Knox was made

acquainted with the Luckensmeyer contract, and was evidently given to understand that it covered the same hay that Martin was getting from respondent, because, under date August 8, 1930, Martin executed to appellant corporation a chattel mortgage to cover advances to be made to him by it and to secure repayment of such advances from the payments to be made under the Luckensmeyer contract, it being provided in the chattel mortgage that releases from the mortgage should from time to time be made as deliveries were made to Luckensmeyer. The description of the hay covered by this chattel mortgage is therein given as ''Five· Hundred (500) tons United States Grade No. 1 leafy alfalfa hay now stored in the warehouse of D. M. Herman on lots 91, 211 and 311 Fourth Extension Colony, Wasco, Kern County, California.'' The mortgage was in due form and recorded in Kern County on August 15, 1930.

Before accepting this chattel mortgage Knox had sent a representative of appellant's Fresno office to Herman's premises to report on the hay. What investigation he made there does not appear, but his report was to the effect that the hay was all there and that none had yet been shipped. According to Knox, Martin also assured him in person that none of the hay had yet been shipped.

Some six days intervened between appellant's receipt of the chattel mortgage made to it and its disbursement of any funds on Martin's account. In the meantime Knox insisted on having delivered to him the bill of sale from Herman to Martin which he says that he had previously seen. After the situation had reached this point appellant proceeded to advance $5,000, of which $3,070.58 was paid to the Bank of Italy, whereby respondent's indebtedness to that institution secured by the earlier chattel mortgage of the hay to it was satisfied. The remaining $1929.42 was paid by appellant to Martin direct.

Shortly subsequent to these transactions it was discovered that Martin was in financial straits and that a month, more or less, before the making of the bill of sale from Herman to him of July 25, 1930, with the accompanying written contract of sale, he had received from respondent Herman 106 tons of hay, for which Herman ·was now claiming credit as part of that which he was, under the bill of·

sale and contract, bound to deliver. Herman did deliver, after the making of the arrangement between Martin and appellant, 132 tons of hay, for which it is conceded that he is entitled to credit and about which there is no dispute. Of the $5,500 which respondent Herman was to have received for the 500 tons of hay sold by him to Martin (reckoned on the basis of the agreed price of $11 per ton) the record shows that Herman actually got in all $4,070.58, which we take to have been made up of the $3,070.58 paid by appellant to the Bank of Italy in settlement of Herman's mortgage indebtedness to it, and of $1,000 received by Herman from Martin, though respondent says at one point in his testimony that Martin paid $4,000 down, whatever he may mean by that. The remaining $1429.42 of the selling price of his 500 tons of hay respondent Herman never actually got at all.

Of the hay bought from Martin by Luckensmeyer there was, in late July or early August, 1930, actually shipped to Luckensmeyer some 22 tons, inclusive as we take it, of the 13 tons that, according to Martin's bill of sale to him, Luckensmeyer was to have received coincidently with the execution of that document. The effect of Martin's chattel mortgage to appellant Seaboard Dairy Credit Corporation was to subrogate appellant to Martin's right to collect the proceeds of the hay delivered to Luckensmeyer from the latter. Luckensmeyer, however, failed to pay for the 22 tons of hay delivered to him, the result of which was to bring him in default on his contract of purchase from Martin, and coincidently to bring Martin into default under his chattel mortgage to appellant, and to entitle appellant as against Martin to take possession under the terms of this chattel mortgage of the whole 500 tons of hay therein described. Thereupon appellant, recognizing that respondent Herman was entitled to credit for the 132 tons that he had delivered after making his written contract with Martin and his bill of sale to the latter, but claiming that Herman was obligated under these instruments to deliver to it, as subrogated to Martin, the rest of the 500 tons, brought against him the present action in claim and delivery for 350 tons of the hay stored in his (that is respondent Herman's) barns. Why appellant asked only for 350 tons instead of the 368 tons that would result from a deduction

from the 500 tons of the said 132 tons not in dispute we do not know. At any rate, under a writ issued *pendente lite* the sheriff took from respondent and delivered to appellant 350 tons of said hay and on the trial the superior court found appellant entitled to 132 tons only of this amount (that is 132 tons other than the 132 tons that Herman was admittedly entitled to credit for having delivered). Judgment was therefore rendered for the return to the respondent of the rest of the 350 tons taken by the sheriff from his possession, that is for 218 tons or if such redelivery could not be had for its value, found to be $2,398, and from this judgment the present appeal is prosecuted.

In support of the judgment respondent Herman claims:

*First,* that the writings of July 25, 1930, did not fully express the real arrangement between himself and Martin, but that what actually occurred was that about July 1, 1930, a verbal contract was made by the terms of which he sold Martin 500 tons of his hay, not necessarily out of what Herman had in his barns, but with the idea of clearing his fields because his barns were already full; that he thereupon, not from his barns, but from his fields, delivered to Martin 106 tons to apply on the 500 tons, for which he is entitled to credit as against the amounts claimed by appellant; and

*Second,* that having in fact been paid only $4,070.58, which at the agreed price of $11 per ton would call for the delivery of but 370 tons he is entitled to have credited against that amount the two items of 106 tons delivered by him prior to the time the writings were made and 132 tons delivered by him afterward, aggregating 238 tons, leaving him obligated to deliver only 132 tons more, and that he is entitled to have the remaining 218 tons taken out of his possession by the sheriff and delivered to appellant returned to him or in default thereof to recover from appellant their value.

The findings of fact and conclusions of law show that these contentions on respondent's part were adopted by the trial court and their soundness is what we are now called upon to review.

We are unable to perceive on what theory the action of the trial court in allowing respondent credit for the delivery of the 106 tons of hay can be sustained. Over

appellant's objection Herman was allowed to testify that in June or early in July Martin talked to him over the telephone and that in this conversation it was agreed that he should sell Martin 500 tons of the hay for $11 per ton, that he said "We will call this a sale," to which Martin said "Yes," upon which he said to Martin, "You send the papers up later, this is a sale," also that in course of the conversation he said to Martin that as his barns were full the first shipment would be made from his fields; that the transaction was reduced to writing later. This brings the situation squarely within the rule that "the execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument". (Civ. Code, sec. 1625.) The answer raises no question of any fraud or mistake in the formulation or execution on July 25, 1930, of the bill of sale, or of the accompanying contract, nor is there any question about the validity of either instrument. The pleadings are utterly bare of any such issues. They may only be urged if pleaded. (*Harding* v. *Robinson*, 175 Cal. 534, 543 [166 Pac. 808].) Not only are they not here pleaded, but it does not even appear to be claimed that these writings were induced by any fraud, and there is no other evidence of mistake than the mere circumstance that if the conversation could be shown its effect would be to vary the terms of the later writings. If that were ground for its admission section 1625 of the Civil Code and section 1856 of the Code of Civil Procedure would be automatically repealed. Respondent did not even seek to have the writings reformed. In this case the oral arrangement must conclusively be deemed to be merged in the writing and under the provisions of section 1856 of the Code of Civil Procedure it was error to admit evidence of the telephone conversation.

On the part of the respondent, however, it is urged that "even if the preliminary negotiation and understandings of the defendant and George E. Martin were merged in a bill of sale and contract between the parties, this does not preclude parol testimony as to the amount of hay delivered prior to the execution of the bill of sale", and that "in the absence of an estoppel", or in any suit between Herman and Martin, Herman could show that Martin had

accepted hay delivered from the field as part performance of the contract to deliver hay from Herman's barns. With the latter proposition, in itself considered, there can be no quarrel. But as applied to this case it encounters the obstacle that notwithstanding the 106 tons of hay had long since been delivered, the written contract and bill of sale import, as of a later date, an executory obligation to deliver 500 tons and to say that an executory contract has in whole or in part been carried out before it was made is a contradiction in terms. Such a contention is tantamount to saying that the contract did not involve what it purported on its face to involve,—an obligation to deliver *in futuro* 500 tons of hay,—but that the obligation that it did involve was to deliver *in futuro* 500 tons less 106 tons, and that is to directly vary the written contract; and it is equally obnoxious to the language of a bill of sale purporting as of July 25th to convey 500 tons of "baled alfalfa hay now stored in barns located on lots 91 and 211 and 311 Fourth Extension Colony" to assert that if it conveyed anything it was not more than 394 tons of hay there situate and that it should be read as meaning that 106 tons of the hay affected by it had been delivered from somewhere else at some time in the past. That no such showing is competent is well illustrated by such cases as *Third Street Improvement Co.* v. *McLelland,* 23 Cal. App. 369 [137 Pac. 1080], cited in behalf of appellant, where, after a building had been completed an account was stated in writing between the owner and the contractors as to the sums remaining due under the contract and, in the absence of any pleading of mistake, the trial court was held to have acted correctly in striking out evidence that had found its way into the record purporting to show that $500, constituting part of the sum recognized as due in the account stated, had been paid before the account was struck. The appellate court (p. 371) said that "the moment it appeared that the parties had stated their account in writing a presumption arose that the payment of the five hundred dollars made prior thereto, together with all previous oral negotiations, were merged in the written agreement". What arose might, in our opinion, have been characterized as more than a presumption. It was, in the absence of a pleading of fraud or mistake, the inescapable legal consequence of the account stated.

■ Respondent, indeed, claims that these principles have no application to the case at bar because the circumstance that Martin resold the hay created a new relation and appellant is a stranger to the contract between respondent and Martin, and that "strangers are at liberty to show that the written instrument does not disclose the true and full relations between the parties". The point is not to be taken seriously. The inhibition of section 1856 of the Code of Civil Procedure, of any attempt to vary a writing by extrinsic evidence of prior dealings, expressly applies not only as between the parties, but also as between them and their "successors in interest". Since, even as between the original parties, the provisions of section 1625 of the Civil Code and section 1856 of the Code of Civil Procedure would preclude respondent from undertaking to show that the 106 tons of hay delivered before the written contract and bill of sale were made ought to be credited on the deliveries therein provided for, it is manifestly unnecessary, as to that 106 tons, for appellant to rely on any estoppel of respondent to assert the right to such a credit, and we need therefore consider what is said in the briefs about an estoppel only with reference to the remaining features of the case about to be discussed.

It has been seen that for the hay described in the writings referred to respondent has in fact been paid only $4,070.58. That would, at the agreed price of $11 per ton pay for only 370 tons. If, therefore, respondent is only obligated to deliver the hay that he has actually been paid for, it being admitted that he actually delivered 132 tons under the contract, the extent of his obligation to make further deliveries without further payment would be limited to 238 tons, whereas, at appellant's behest the sheriff took from him and delivered to appellant 350 tons. We must determine, therefore, whether respondent is entitled to so much of the hay awarded to him by the judgment (or, if it cannot be redelivered, to its value) as is measured by the difference between 350 tons and 238 tons, that is, 112 tons.

■ The bill of sale dated as of July 25th purports, indeed, to acknowledge receipt by respondent Herman of the whole $5,500 necessary to pay for the entire 500 tons of hay. But the written contract between the parties purporting on its face to be executed "in conjunction with Bill

of Sale made on this day" acknowledges, as made, only a part payment of $1, provides for an advance of $3 per ton to be made as soon as "all papers are signed", and provides for the balance "to be paid when hay is unloaded in good order". Since, moreover, the contract provides in terms that it is "in conjunction" with the bill of sale, it must be so considered, but on the question of payment they contradict each other in terms, and since recitals in writings are not conclusive on the question of consideration (Code Civ. Proc., sec. 1962, subd. 2), it was, unless some estoppel forbade it, competent by evidence extrinsic to the writings to show what had been actually paid. ■ Such evidence having in fact been received and the actual amount paid to respondent being shown to have been only $4,070.58, it is now claimed in his behalf that, notwithstanding the language of the bill of sale, the fair construction of it and the contract, when read in conjunction with each other and in the light of the surrounding circumstances, is that the parties did not intend the title to pass and that in fact title never did pass to Martin to the whole 500 tons of hay nor to any hay except as Martin from time to time ordered deliveries to be made and paid for them and, therefore, that except to the extent that payment has been made, appellant never became entitled to any hay from respondent. The trial court's findings upheld these contentions. It is doubtless true that unless the title to the hay had passed to Martin, that is, if the transaction between respondent Herman and himself could be treated as in the nature of a conditional sales contract, respondent would be under no obligation to deliver any hay for which he was not paid. Much space is devoted in the briefs to the question whether the court's finding that the title to hay neither delivered nor paid for remained in respondent can be upheld, and it is apparently assumed by respondent's counsel and asserted in the reply brief for appellant, that the test of appellant's right to any hay for which respondent has not been paid is "whether or not the documents transferred title from respondent to Martin and whether, assuming they did not, respondent is entitled to contend otherwise". But we do not agree that this is the test at all and consider it immaterial to the rights of the parties whether the trial court was correct in this portion of its findings or not.

At the time the sale to Martin was made, section 3049 of the Civil Code (since repealed) was in force, reading as follows:

"One who sells personal property has a special lien thereon, dependent on possession, for its price, if it is in his possession when the price becomes payable, and may enforce his lien in like manner as if the property was pledged to him for the price."

It had been expressly held in *Eads* v. *Kessler*, 121 Cal. 244 [53 Pac. 656], that under this enactment the personal property on which the seller retained a lien was not personal property as to which the seller retained the title, since as to that, having the title, he needed no lien, but personal property to which he had already parted with the title but of which he retained the possession. The court in that case says (Ibid., p. 246): "But that section (3049) contains nothing which changes the common-law rule upon the subject; it was a mere statement in a convenient form of what the common law is. . . . and the common law is, that a lien such as is contended for in the case at bar exists only under a complete sale which passes the title to the property."

It follows that respondent retained a lien on any part of the hay for which he had not in fact been paid, and that that lien must prevail unless by some application of the doctrine of estoppel he is not permitted to rely on it, but we cannot see that under the facts of this case there can be any such estoppel. Appellant, when it acquired its chattel mortgage, knew that respondent was still in possession of the hay and it is charged with knowing the rights with which respondent was clothed under the law by reason of such retained possession. It is indeed claimed that respondent's daughter, as his representative, visited appellant's office in connection with respondent's chattel mortgage to the bank and familiarized herself with appellant's arrangements to pay off that mortgage and that her knowledge of these arrangements must be imputed to her father. It is doubtful whether the evidence would support such a contention but in any event the amount appellant paid in discharging the mortgage was, as we saw, only $3,070.58, which would at $11 per ton, pay for only a fraction over 279 tons of hay, and even if respondent were charged by reason of information believed to have been imparted to his

daughter with notice of that payment, such notice could hardly estop him from denying appellant's right to as much of the hay as it now claims.

Our conclusion is that appellant became entitled to the hay for which respondent was actually paid, that is, 370 tons, as against which respondent is entitled to credit for 132 tons delivered by him after the making of the bill of sale and prior to the seizure by the sheriff, leaving the appellant entitled to retain 238 tons of the hay so seized and delivered to it and that the judgment should be so modified as to provide for the return to respondent of only the residue of 112 tons of the hay seized by the sheriff or in case it cannot be redelivered for its value stipulated to be $11 per ton, making $1,232, together with his costs in the superior court, instead of the 218 tons or the alternative of $2,398 and costs awarded by the trial court.

The judgment of the trial court is therefore so modified, and as modified is affirmed.

Barnard, P. J., and Marks, J., concurred.